IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

BRIAN WILSON,

      Plaintiff,

    v.                                     Civil Action No. 3:23cv89

PAMUNKEY REGIONAL JAIL
AUTHORITY, *et al.*,

      Defendants.

## MEMORANDUM OPINION

This matter comes before the Court on two Motions: (1) Defendants Pamunkey Regional Jail Authority ("PRJA"), Officer Juan Ramirez-Castro[1], and Lieutenant Tina Hackett's (collectively, the "PRJ Defendants") Renewed Motion to Dismiss (the "PRJ Motion"), (ECF No. 50);[2] and, (2) Defendant Dr. Shridhar Bhat's Renewed Motion to Dismiss (the "Bhat Motion"), (ECF No. 54) (collectively, "the Motions"). Mr. Wilson responded to the Motions. (ECF Nos. 52, 56.) Defendants replied. (ECF Nos. 53, 57.)

The matter is ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid in the decisional process. For the reasons that follow, the Court will grant in part and deny in part the PRJ Motion, (ECF No. 50), and will deny the Bhat Motion, (ECF No. 54).

---

[1] The Complaint incorrectly named Officer Rivera as a defendant in this case. (*See* ECF No. 1.) The parties agreed that Officer Juan Ramirez-Castro was the proper party and, on January 5, 2024, the Court substituted Officer Juan Ramirez-Castro for Officer Rivera. (ECF No. 47, at 1.)

[2] The Court employs the pagination assigned by the CM/ECF docketing system.

## I.  Factual and Procedural Background

**A.      Factual Background[3]**

**1.       The July 2021 Eye Injury and Emergency Medical Treatment**

In July 2021, Mr. Wilson was incarcerated as a post-conviction detainee in Pamunkey Regional Jail in Hanover, Virginia.  (ECF No. 1 ¶ 15; ECF No. 49, at 1.)  During a basketball game in the recreation yard, another inmate's finger stabbed Mr. Wilson in his left eye.  (ECF No. 1 ¶¶ 15–16.)  Mr. Wilson's eye bled, and Lieutenant Hackett "immediately" escorted him to the nurse on staff at the regional jail.  (ECF No. 1 ¶¶ 17–19.)  The nurse on staff inspected Mr. Wilson's eye and told Lieutenant Hackett that Mr. Wilson "needed to immediately be taken to the emergency room."  (ECF No. 1 ¶ 19.)  Officer Ramirez-Castro "immediately" took Mr. Wilson to Bon Secours Medical Center ("Bon Secours") "via a patrol vehicle."  (ECF No. 1 ¶ 20.)  Officer Ramirez-Castro "did not use his sirens."  (ECF No. 1 ¶ 21.)

At Bon Secours, the staff informed Mr. Wilson and Officer Ramirez-Castro that the hospital lacked the medical resources necessary to treat Mr. Wilson's eye injury and that Mr. Wilson required transport to VCU Medical Center.  (ECF No. 1 ¶ 22.)  The head doctor at Bon Secours informed Officer Ramirez-Castro that Mr. Wilson should be transported via an emergency ambulance because "time was of the essence in treating Mr. Wilson's eye injury." (ECF No. 1 ¶ 23.)

Officer Ramirez-Castro called his supervisor, Lieutenant Hackett, to seek approval for the ambulance transport.  (ECF No. 1 ¶ 24.)  Lieutenant Hackett responded that Mr. Wilson should

---

[3] In considering the Motions to Dismiss, the Court will assume the well-pleaded factual allegations in the Complaint to be true and will view them in the light most favorable to Mr. Wilson.  *See Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Republican Party of N.C. v. Martin*, 7 F.3d 1130, 1134 (4th Cir. 1992).

not travel via ambulance and that instead Officer Ramirez-Castro should drive him to VCU Medical Center. (ECF No. 1 ¶ 25.) Officer Ramirez-Castro "placed Mr. Wilson in his patrol car" and "drove [him] to VCU Medical Center" without using the emergency lights on the patrol car. (ECF No. 1 ¶¶ 26–27.) Mr. Wilson avers that it took "approximately one hour" to get to VCU Medical Center from Bon Secours. (ECF No. 1 ¶ 28.)

Upon arrival at VCU Medical Center, Officer Ramirez-Castro "parked his patrol car at the top of a hill, approximately one block away from the Emergency Room entrance." (ECF No. 1 ¶ 29.) Mr. Wilson was "forced to walk slowly to the Emergency Room in shackles while his vision was impaired and [his] eye was bleeding." (ECF No. 1 ¶ 30.) VCU Medical Center staff informed Mr. Wilson that "because he did not take an emergency ambulance and because VCU Medical Center was not expecting his arrival or his specific issue[,] they needed to schedule emergency eye surgery for him." (ECF No. 1 ¶ 31.) He waited "approximately five hours" to undergo emergency eye surgery. (ECF No. 1 ¶ 32.)

Several days later, Mr. Wilson returned to VCU Medical Center and upon removing the eye patch he had worn since surgery, "realized that he had no vision in his eye." (ECF No. 1 ¶¶ 34–36.) One week later during his second follow-up appointment at VCU Medical Center, Mr. Wilson learned that "the vision in his left eye would never return." (ECF No. 1 ¶ 38.) The surgeon who performed the emergency eye surgery told Mr. Wilson that if he had arrived at VCU Medical Center via ambulance, Mr. Wilson would have arrived earlier for surgery and the hospital would have been more prepared for his arrival. (ECF No. 1 ¶ 39.) The surgeon opined that "this time difference would have saved the vision in Mr. Wilson's eye." (ECF No. 1 ¶ 39.)

In October 2021, Mr. Wilson was released from jail. (ECF No. 1 ¶ 40.)

### 2.    **2022 Denials of Medical Treatment Requests and Refusal to Refer Mr. Wilson to an Eye Specialist**

In January 2022, Mr. Wilson was reincarcerated at Pamunkey Regional Jail. (ECF No. 1 ¶ 40.) From January 2022 to at least the time of the filing of the Complaint on February 2, 2023, Mr. Wilson experienced "various medical issues" relating to his eye injury, including "extreme pain" in the left eye, headaches, and loss of vision in his *right* eye. (ECF No. 1 ¶¶ 41–42.) Since January 2022, Mr. Wilson "made over twenty requests for medical treatment," all of which were "denied without sufficient explanation" until September 2022. (ECF No. 1 ¶¶ 42–43.)

In or around September 2022, Mr. Wilson saw a general doctor, Defendant Dr. Bhat, who is "not an eye specialist." (ECF No. 1 ¶ 43.) Dr. Bhat told Mr. Wilson his injuries were "merely cosmetic related—despite the fact that Mr. Wilson was complaining of excruciating pain and vision loss in his other eye." (ECF No. 1 ¶ 43.) Dr. Bhat allegedly refused to refer Mr. Wilson to a specialist. (ECF No. 1 ¶ 43.) As of the date of the filing of the Complaint on February 2, 2023, Mr. Wilson's "complaints continue[d] to be ignored." (ECF No. 1 ¶ 44.)

### B.    **Procedural Background**

On February 2, 2023, Mr. Wilson filed a four-count Complaint alleging the following causes of action:

**Count I:**      Denial of Federal Rights Under Color of State Law, 42 U.S.C. § 1983,[4] in violation of the Eighth Amendment[5] (against all Defendants)

**Count II:**     Gross Negligence and Negligence (against the PRJ Defendants)

**Count III:**    Willful and Wanton Disregard for the Plaintiff's Rights[6] (against the PRJ Defendants)

**Count IV:**     Negligent Infliction of Emotional Distress (against the PRJ Defendants)

(ECF No. 1, at 7–9.)

On April 17, 2023, PRJA and Officer Ramirez-Castro filed a Motion to Dismiss, (ECF No. 16), as well as an Answer, (ECF No. 18).  On May 1, 2023, Dr. Bhat filed a Motion to Dismiss.  (ECF No. 22.)  On July 26, 2023, Lieutenant Hackett filed a Motion to Dismiss, (ECF No. 42), as well as an Answer, (ECF No. 44).

On January 31, 2024, the Court denied without prejudice the pending Motions to Dismiss because "the record [wa]s silent as to whether Mr. Wilson was confined as a pretrial detainee or as a post-conviction felon at the time of the alleged incidents."  (ECF No. 48, at 3.)  In its

---

[4] Section 1983 states, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.

[5] The Eighth Amendment to the United States Constitution states, in pertinent part: "Excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted*." U.S. Const. Am. VIII (emphasis added).

[6] Count III is styled as "Willful and Wanton Disregard for the Plaintiff's Rights."  The Court is unaware of an independent claim for willful and wanton disregard for the plaintiff's rights and construes Count III as a claim for willful and wanton negligence.

January 31, 2024 Order, the Court also directed Mr. Wilson to provide a statement identifying his conviction status at the times of the alleged incidents. (ECF No. 48.) On February 7, 2024, Mr. Wilson clarified that "at all times relevant to his Complaint [Mr. Wilson] was a post-conviction detainee." (ECF No. 49, at 1.)

On February 26, 2024, the PRJ Defendants filed their Renewed Motion to Dismiss, consolidating the earlier PRJA-Ramirez-Castro and Hackett motions. (ECF No. 50.) Mr. Wilson responded, (ECF No. 52), and the PRJ Defendants replied, (ECF No. 53). On March 20, 2024, Dr. Bhat filed a renewed Motion to Dismiss. (ECF No. 54.) Mr. Wilson responded, (ECF No. 56), and Dr. Bhat replied, (ECF No. 57).

### II. Legal Standard:  Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). This analysis is context specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193 (citation omitted). The court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *see also Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)). This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

### III. Analysis

Defendants challenge each of the Complaint's four counts: (1) denial of federal rights under color of state law, 42 U.S.C. § 1983, in violation of the Eighth Amendment against all Defendants; (2) gross negligence and negligence against the PRJ Defendants; (3) willful and wanton disregard for the Plaintiffs rights against the PRJ Defendants; and, (4) negligent infliction of emotional distress ("NIED") against the PRJ Defendants. (ECF No. 1, at 7–9; ECF No. 51, at 6–17; ECF No. 55, at 4–8.)

The Court will dismiss Count I against Lieutenant Hackett because Mr. Wilson has not plausibly stated a claim for deliberate indifference as to her. The Court will also dismiss Count I

against PRJA because Mr. Wilson has not stated a claim for municipal liability. However, the Court will not dismiss Count I against Dr. Bhat and Officer Ramirez-Castro because Mr. Wilson plausibly stated a claim for deliberate indifference as to these Defendants.

The Court will dismiss Counts II and III against Lieutenant Hackett and Officer Ramirez-Castro because the statute of limitations has run as to the July 2021 allegations against them. Counts II and III will remain against PRJA with respect to the January 2022 and subsequent events because the statute of limitations has not run, and Mr. Wilson plausibly states a claim of negligence, gross negligence, and willful and wanton negligence.

The Court will dismiss Count IV in its entirety because Mr. Wilson fails to state a claim for negligent infliction of emotional distress.

### A.   Section 1983 Deliberate Indifference Claims

#### 1.   Legal Standard:  Eighth Amendment Deliberate Indifference

"A prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment."[7] *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).  To state an Eighth Amendment claim for cruel and unusual punishment, an inmate must allege facts showing "(1) that objectively the deprivation of a basic human need was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

Under the objective prong, the inmate must allege facts to suggest that the deprivation complained of was extreme and amounted to more than the "routine discomfort" that constitutes

---

[7] The Eighth Amendment to the United States Constitution states, in pertinent part: "Excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted*." U.S. Const. Am. VIII (emphasis added).

"part of the penalty that criminal offenders pay for their offenses against society." *Strickler v. Waters*, 989 F.2d 1375, 1380 n.3 (4th Cir. 1993) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). "In order to demonstrate such an extreme deprivation, a prisoner must allege 'a serious or significant physical or emotional injury resulting from the challenged conditions.'" *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (quoting *Strickler*, 989 F.2d at 1381). A medical condition is "serious" if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (citations and internal quotation marks omitted). Furthermore, where, as here, an Eighth Amendment claim is predicated on a delay in the provision of medical care, the plaintiff must allege facts that suggest "that the delay result[ed] in substantial harm." *Webb v. Hamidullah*, 281 F. App'x 159, 166–67 & n.13 (4th Cir. 2008) (citing *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000)). "[T]he substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001) (citation omitted); *see also Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (citation omitted) ("frequent complaints of severe pain" qualifies as "substantial harm").

   The subjective prong requires the plaintiff to allege facts that indicate a particular defendant knew of and disregarded a substantial risk of serious harm to his or her person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)). A culpable *mens rea* "requires proof that the prison official subjectively 'knew' of the substantial risk of harm to a prisoner and 'consciously disregarded' it, thus incorporating the concept of criminal recklessness

9

as defined in the Model Penal Code.[8]" *Ford v. Hooks*, 108 F.4th 224, 230 (4th Cir. 2024) (citing *Farmer*, 511 U.S. at 837, 839). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer*, 511 U.S. at 837.

*Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Quinones*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837); *see also Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997). Thus, for a deliberate indifference claim to survive a motion to dismiss, the plaintiff must assert facts sufficient to form an inference that "the official in question subjectively recognized a substantial risk of harm" and "that the official in question subjectively recognized that his [or her] actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich*, 129 F.3d at 340 n.2).

---

[8] The Model Penal Code § 2.02(c) states, in pertinent part:

**Recklessly.** A person acts recklessly . . . when he [or she] consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his [or her] conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her],

its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

MODEL PENAL CODE § 2.02(c) (Am. L. Inst. 2017).

**2.**    **Mr. Wilson Sufficiently Alleges a Claim of Deliberate Indifference Against Dr. Bhat in Count I for Failing to Provide Adequate Treatment and Refusing to Refer Mr. Wilson to an Eye Specialist**

In Count I, Mr. Wilson alleges that from January 2022 to at least the date of filing, February 2, 2023, Mr. Wilson suffered from "extreme pain in the eye, headaches, and ha[d] begun to lose his vision in his [right] eye." (ECF No. 1 ¶ 42.)  On or around September 2022, Dr. Bhat—a general doctor, not an eye specialist—told Mr. Wilson that his complaints were "merely cosmetic related" and declined to refer Mr. Wilson to an eye specialist. (ECF No. ¶ 43.)

**a.**    **Mr. Wilson Satisfies the Objective Prong as to Dr. Bhat**

Under the objective prong of a deliberate indifference claim, the loss of vision in Mr. Wilson's right eye and his "extreme pain" plainly allege "a serious medical condition that satisfies the objective prong of an Eighth Amendment *prima facie* case." *See Johnson*, 145 F.3d at 168.  The combination of these symptoms—extreme eye pain and loss of vision in his only functional eye—exceeds the "routine discomfort" that constitutes "part of the penalty that criminal offenders pay for their offenses against society." *See Strickler*, 989 F.2d at 1380 n.3 (internal citation omitted).  The refusal to refer Mr. Wilson to an eye specialist to assess these plainly serious and unusual symptoms satisfies the objective prong of a deliberate indifference claim at the motion to dismiss stage. *See Farmer*, 511 U.S. at 834; (ECF No. 1 ¶ 43).

**b.**    **Mr. Wilson Satisfies the Subjective Prong as to Dr. Bhat**

Under the subjective prong of a deliberate indifference claim, a prison official's "failure to respond to an inmate's known medical needs raises an inference of deliberate indifference to those needs." *Scinto v. Stansberry*, 841 F.3d 219, 226 (4th Cir. 2016).  "Prison-based medical staff are required to provide inmates with constitutionally adequate treatment, not merely 'some treatment.'" *Boley v. Armor Corr. Health Servs., Inc.*, No. 2:21cv197 (RCY), 2022 WL

16950920, at *9–10 (E.D. Va. Nov. 15, 2022) (quoting *De'Lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013)). "A prison medical professional who serves as a gatekeeper for other medical personnel capable of treating the condition may be held liable under the deliberate indifference standard if she [or he] delays or refuses to fulfill that gatekeeper role." *Id.* (cleaned up) (quoting *Mata v. Saiz*, 427 F.3d745, 751 (10th Cir. 2005)); *see also Sealock*, 218 F.3d at 1211 (finding deliberate indifference where prison officials "prevent[ed] an inmate from receiving treatment or den[ied] him access to medical personnel capable of evaluating the need for treatment" and "the medical professional [knew] that his role in a particular medical emergency [was] solely to serve as a gatekeeper for other medical personnel capable of treating the condition"). The subjective prong also can be established by showing that "the need for treatment is obvious, yet medical officials provide medical care that is so cursory as to amount to no treatment at all." *Boley*, 2022 WL 16950920, at *9 (citing *King v. United States*, 526 F. App'x 358, 362 (4th Cir. 2013)).

Viewing the allegations in the light most favorable to Mr. Wilson, sufficient facts exist to infer that Dr. Bhat knew of the serious risk to Mr. Wilson's health and failed to provide adequate treatment or refer Mr. Wilson to a specialist who could appropriately address Mr. Wilson's concerns. *See Iqbal*, 556 U.S. at 679; *see also Kensington*, 684 F.3d at 467; *see also Ford*, 108 F.4th at 230; (ECF No. 1). Like the doctor in *Boley*, who did "not investigate beyond retaking vitals, even in light of Boley's clear complaints and additional symptoms[,]" Dr. Bhat dismissed Mr. Wilson's clear complaints of loss of vision and extreme pain as "merely cosmetic." *See* 2022 WL 16950920, at *10 (denying a motion to dismiss Eighth Amendment claims against prison doctor); (ECF No. 1 ¶ 43). Even a layperson could conclude the symptoms Mr. Wilson complained of required a referral to an eye specialist, especially where Mr. Wilson had already permanently lost vision in his other eye. *See Boley*, 2022 WL 16950920, at *10; (ECF No. 1 ¶

42).  Mr. Wilson states a claim that Dr. Bhat had subjective knowledge because, although the need for treatment was "obvious," Dr. Bhat "provide[d] medical care" that was "so cursory as to amount to no treatment at all."  *See Boley*, 2022 WL 16950920, at *9 (internal citation omitted).

Thus, Mr. Wilson's allegation that Dr. Bhat did not "fulfill [his] gatekeeper role" and refer Mr. Wilson to an eye specialist to address his "serious medical need" due to extreme pain and loss of vision suffices to assert a deliberate indifference claim against Dr. Bhat at the motion to dismiss stage.  *See Boley*, 2022 WL 16950920, at *8 (citing *Mata*, 427 F.3d at 751); *see also Rich*, 129 F.3d at 340 n.2; *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015); (ECF No. 1 ¶ 43).  Therefore, the Court will deny the Motion to Dismiss the § 1983 claim against Dr. Bhat in Count Ibecause Mr. Wilson alleged facts sufficient to show deliberate indifference to a serious medical need.  (ECF No. 54.)

13

### 3. Officer Ramirez-Castro Cannot Invoke Qualified Immunity as to Counts I Through VI for Delaying Mr. Wilson's Emergency Eye Surgery Because Further Fact Development Is Required

The Court turns to all counts against Officer Ramirez-Castro (not just Count I) because he invokes qualified immunity, which, if successful, would render any further analysis unnecessary. Because the Court will dismiss all claims against Lieutenant Hackett pursuant to Rule 12(b)(6), the Court does not address her claim of qualified immunity. Officer Ramirez-Castro claims qualified immunity for the asserted violations. Because greater fact development is necessary to determine whether Officer Ramirez-Castro violated a clearly established right of which a reasonable person would have known, the Court will not resolve his qualified immunity claim at this stage.

#### a. Legal Standard: Qualified Immunity

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) (citing *Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987); *Gooden v. Howard Cnty.*, 954 F.2d 960, 968 (4th Cir. 1992) (en banc)). For the right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 751 (2011).

Because qualified immunity operates as immunity from suit, and not merely as a defense to liability, *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), a court should generally rule on its application "early in the proceedings so that the costs and expenses of trial are avoided where the

defense is dispositive." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). "[A] defendant can raise the qualified-immunity defense at both the motion to dismiss and summary judgment stage," but it "is peculiarly well-suited for resolution at the summary judgment stage." *Willis v. Blevins*, 966 F. Supp. 2d 646, 652 (E.D. Va. 2013) (quoting *Tobey v. Jones*, 706 F.3d 379, 393–94 (4th Cir. 2013)); *see also Monk v. Gulick*, No. 3:20cv518 (JAG), 2021 WL 1265205, at *6 (E.D. Va. Apr. 6, 2021) (denying defendants' motion to dismiss on qualified immunity grounds because deciding whether they acted reasonably "requires greater factual development and is better decided once discovery has been conducted" (quoting *Tobey*, 706 F.3d at 389)). When a defendant raises qualified immunity on a motion to dismiss, the operative question is whether a reasonable officer would have believed that his or her actions or omissions, as alleged in the complaint, were lawful. *Mays v. Sprinkle*, 992 F.3d 295, 302 n.5 (4th Cir. 2021) (citing *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987)).

The court applies an objective, two-part inquiry to determine "whether a government official has violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991) (quoting *Harlow*, 457 U.S. at 818). "To escape dismissal of a complaint on qualified immunity grounds, a plaintiff must (1) allege a violation of a right (2) that is clearly established at the time of the violation." *Evans v. Chalmers*, 703 F.3d 636, 646 (4th Cir. 2012); *see also Roncales v. Cnty. of Henrico*, 451 F. Supp. 3d 480, 495 (E.D. Va. 2020) (citing *Tobey*, 706 F.3d at 386–87) (stating that "to survive a qualified-immunity based 12(b)(6) motion to dismiss," a plaintiff "must have plausibly alleged in his [or her] complaint that his [or her] constitutional rights were violated"). Officials are entitled to qualified immunity unless a plaintiff satisfies both prongs of the test.

*Long v. Beres*, No. 3:10cv532 (JAG), 2012 WL 405069, at \*2 (E.D. Va. Feb. 8, 2012) (citing

*Pearson v. Callahan*, 555 U.S. 223, 236–37 (2009)).

> **b.      Whether Officer Ramirez-Castro Can Invoke Qualified**
> **Immunity Requires Further Factfinding**

Officer Ramirez-Castro invokes qualified immunity on the grounds that a reasonable

officer in his position would not have known that his actions were unconstitutional because he

was interpreting "vague instructions from a medical professional." (ECF No. 51, at 9.)

"[G]overnment officials performing discretionary functions enjoy qualified immunity if their

conduct 'does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known' at the time of the conduct." *Wheeler v. Gilmore*, 998 F.

Supp. 666, 669 (E.D. Va. 1998) (citing *Harlow*, 457 U.S. at 818).

The general underlying right at bar—the right to receive timely medical care—was

"clearly established" at the time of the alleged conduct. *See, e.g., Smith v. Smith*, 589 F.3d 736,

738–39 (4th Cir. 2009) ("[D]eliberate indifference can be manifested . . . by prison guards in

intentionally denying or delaying access to medical care or intentionally interfering with the

treatment once prescribed."); *Coats v. Pope*, No. 1:17-cv-2930-TLW, 2019 WL 5586871, at \*7

(D.S.C. Oct. 30, 2019) (denying qualified immunity to prison officers where "it was clearly

established that the Fourteenth Amendment forbids prison officials who observe an inmate who

is sweating and breathing heavily, vomiting, incapable of speaking, standing or walking, and

having seizures from delaying approximately forty-three minutes in summoning medical care")

(collecting cases).

It is unclear at this juncture whether Officer Ramirez-Castro "subjectively recognized

that his actions were 'inappropriate in light of that risk.'" *See Cleveland*, 372 F.3d at 303

(quoting *Rich*, 129 F.3d at 340 n.2). However, at this stage, Mr. Wilson simply must allege a

claim that is "plausible on its face." *Twombly*, 550 U.S. at 555 (internal quotation marks omitted). On the facts alleged, a reasonable inference may be drawn that—after hearing from a medical professional that "time was of the essence"—driving Mr. Wilson by patrol car (without activating emergency lights) rather than emergency ambulance constituted an unlawful delay in Mr. Wilson's necessary medical treatment. Furthermore, a reasonable inference may be drawn that Officer Ramirez-Castro drew "the inference between those general facts and the specific risk of harm confronting the inmate." *See Iqbal*, 556 U.S. at 678; *Quinones*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837). Therefore, because Mr. Wilson plausibly alleges that Officer Ramirez-Castro violated a clearly established right of which a reasonable person would have known, the Court will not resolve the qualified immunity claim at this stage.

### 4. Mr. Wilson States a Deliberate Indifference Claim in Count I Against Officer Ramirez-Castro for Delaying His Emergency Eye Surgery

Mr. Wilson's claim of deliberate indifference against Officer Ramirez-Castro in Count I survives the motion to dismiss because Mr. Wilson adequately alleges both the objective and subjective prongs of a deliberate indifference claim.

#### a. Mr. Wilson Satisfies the Objective Prong as to Officer Ramirez-Castro

As to the objective prong, the deprivation is extreme and amounts to more than "routine discomfort." *See Strickler*, 989 F.2d at 1380 n.3 (citations omitted). Permanent loss of vision represents "a serious or significant physical . . . injury." *See De'Lonta*, 30 F.3d at 634; *see also Garrett*, 254 F.3d at 950 ("[T]he substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain."). The United States Court of Appeals for the Fourth Circuit has described the permanent loss of vision as "a serious medical condition that satisfies the objective prong of an Eighth Amendment *prima facie* case." *See Quinones*, 145

17

F.3d at 168 (discussing the permanent loss of vision due to a prisoner's undiagnosed pituitary tumor). (ECF No. 1 ¶¶ 36, 38.)

Even if Officer Ramirez-Castro had not realized that Mr. Wilson's injury could result in permanent vision loss, a bleeding eye constitutes an injury that "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *See Iko*, 535 F.3d at 241; (ECF No. 1 ¶ 17 ("[T]he seriousness of his injury became obvious to everyone around.")). Further cementing the seriousness of Mr. Wilson's eye injury, the prison nurse stated that it required "*immediate*[]" medical treatment at an "emergency room" and the medical staff at Bon Secours likewise informed Officer Ramirez-Castro that "Mr. Wilson should be taken to VCU Medical Center *via an emergency ambulance* because *time was of the essence*." (ECF No. 1 ¶¶ 19, 23 (emphases added).) Mr. Wilson alleges that, despite this notice of the need for emergency medical transport and treatment, Officer Ramirez-Castro delayed necessary medical treatment by driving Mr. Wilson in the patrol car without emergency lights rather than allowing him to be taken via ambulance, and then by making him walk in shackles approximately one block upon arrival to VCU Medical Center while his eye was bleeding. (ECF No. 1 ¶¶ 26–32.)

Mr. Wilson has sufficiently alleged "that the delay resulted in substantial harm," *see Webb*, 281 F. App'x at 166–67 & n.3, by stating that "*because* he did not take an emergency ambulance," he had to wait five hours for emergency surgery, (ECF No. 1 ¶¶ 31–32 (emphasis added)), and that the surgeon opined that avoiding this delay "would have saved Mr. Wilson's vision," (ECF No. 1 ¶ 39).

**b.    Mr. Wilson Satisfies the Subjective Prong as to Officer Ramirez-Castro**

The subjective prong requires that the prison official acted recklessly by consciously disregarding a substantial risk of harm. *See Ford*, 108 F.4th at 230. "A prison official's

18

subjective actual knowledge can be proven through circumstantial evidence showing . . . that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Makdessi*, 789 F.3d at 133 (quoting *Farmer*, 511 U.S. at 842 (1970) (internal quotation marks omitted)). Direct evidence of actual knowledge is not required. *Id.* (citing *Farmer*, 511 U.S. at 842–43).

Taking the facts alleged as true and drawing all reasonable inferences in favor of Mr. Wilson, Officer Ramirez-Castro was *aware of* the serious medical need because the Bon Secours head doctor told him directly that Mr. Wilson should travel by emergency ambulance because "time was of the essence." (ECF No. 1 ¶¶ 22–23.) This conversation "exposed [Officer Ramirez-Castro] to information concerning the risk," and permits an inference that he "thus must have known about it." *See Makdessi*, 789 F.3d at 133; *see also DePaola v. Clarke*, 884 F.3d 481, 488 (4th Cir. 2018) (where prison officials responded to a plaintiff's prior suicide attempt, prison officials were "on notice" that plaintiff required attention for ongoing serious mental health conditions that posed a substantial risk to him).

Officer Ramirez-Castro then *consciously disregarded* this serious medical need by following his supervisor's contrary directive to transport Mr. Wilson via patrol car instead of the medical professional's advice. (*See* ECF No. 1 ¶¶ 24–27.) That Officer Ramirez-Castro neither used his emergency lights nor parked near the Emergency Room further supports a reasonable inference that the officer disregarded the doctor's express admonition that "time was of the essence in treating Mr. Wilson's eye injury." (ECF No. 1 ¶¶ 23, 27, 29.)

Mr. Wilson's Complaint "achieves facial plausibility" as to the § 1983 claim against Officer Ramirez-Castro. *See Twombly*, 550 U.S. at 556. The facts alleged "support a reasonable inference" that Officer Ramirez-Castro demonstrated deliberate indifference to Mr. Wilson's

serious medical need when he delayed emergency treatment by driving Mr. Wilson in his patrol car rather than allowing him to "be taken . . . via an emergency ambulance" where "time was of the essence," and then making him walk one block in shackles while his eye was bleeding. *See Iqbal*, 556 U.S. at 663; (ECF No. 1 ¶ 23). Therefore, the Court will deny Motion to Dismiss as to the § 1983 claim against Officer Ramirez-Castro. (ECF No. 50.)

> **5.    The Court Will Dismiss the § 1983 Claim Against Lieutenant Hackett in Count I Because Mr. Wilson Did Not Assert That She Had Any <u>Awareness of a Substantial Risk of Serious Harm to Mr. Wilson</u>**

Mr. Wilson does not state a claim for deliberate indifference against Lieutenant Hackett in Count I because he does not allege facts indicating that she knew of the doctor's recommendation to transport Mr. Wilson by emergency ambulance because "time was of the essence." *See Clark v. Smith*, No. 22-6958, 2023 WL 4198038, at *2 (4th Cir. June 27, 2023) (affirming the dismissal of claims against a supervisor because "[s]pecifically, there are no allegations as to . . . what interactions they were aware of aside from their own"). In July 2021, after the head doctor at Bon Secours informed Officer Ramirez-Castro that Mr. Wilson "should be taken to VCU Medical Center via emergency ambulance because time was of the essence", Officer Ramirez-Castro called his supervisor Lieutenant Hackett "to ask if he should allow Mr. Wilson to be taken to VCU Medical Center via ambulance." (ECF No. 1 ¶¶ 23–24.) Lieutenant Hackett told Officer Ramirez-Castro "that Mr. Wilson should not be taken to VCU Medical Center via ambulance" but rather that Officer Ramirez-Castro "should instead transfer Mr. Wilson to VCU Medical Center himself." (ECF No. 1 ¶ 25.)

> **a.    <u>Mr. Wilson Satisfies the Objective Prong as to Lt. Hackett</u>**

Even viewing the facts in the light most favorable to Mr. Wilson, no allegation exists that Lieutenant Hackett knew of the exchange between the head doctor at Bon Secours and Officer

Ramirez-Castro. *See Clark*, 2023 WL 4198038, at *2; *see also Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001); *Ford*, 108 F.4th at 230; (ECF No. 1 ¶ 24). Although the facts plausibly state that Officer Ramirez-Castro had subjective awareness of the medical need because the doctor spoke to him directly, recommended ambulance transport, and communicated that "time was of the essence", no facts suggest that Officer Ramirez-Castro relayed any of that critical information to Lieutenant Hackett. (ECF No. 1 ¶ 23.) Because Mr. Wilson does not allege that Lieutenant Hackett had any subjective awareness of the substantial risk of serious harm, he has not stated a deliberate indifference claim against her. *See DePaola*, 884 F.3d at 488 (plaintiff "d[id] not allege in his complaint that any of the other defendants had actual knowledge of his mental health conditions, leaving his claim against them insufficient as a matter of law").

**b.      Mr. Wilson Satisfies the Subjective Prong as to Lt. Hackett**

Mr. Wilson also alleges no facts from which the Court can infer that Lieutenant Hackett "dr[e]w the inference between" the requested ambulance transport and the risk to Mr. Wilson's eye. *See Johnson*, 145 F.3d at 168. When the prison nurse initially told Lieutenant Hackett "that Mr. Wilson needed to immediately be taken to the emergency room," (ECF No. 1 ¶ 19), Mr. Wilson was "immediately . . . taken to the emergency room." (ECF No. 1 ¶ 19–20.) Although the Complaint alleges that she directed Officer Ramirez-Castro to take Mr. Wilson by patrol car, the Complaint does *not* allege that Lieutenant Hackett ever knew that the Bon Secours doctor specifically recommended transport to VCU Medical Center by emergency ambulance because "time was of the essence." (ECF No. 1 ¶ 23.) Mr. Wilson's allegation that her subordinate knew does not suffice. *See Clark*, 2023 WL 4198038, at *2. Mr. Wilson has not alleged that Lieutenant Hackett *herself* knew of and disregarded a substantial risk of serious harm. Accordingly, the Court will grant the PRJ Motion as to the § 1983 claim against Lieutenant

Hackett. *See Johnson*, 145 F.3d at 167 (quoting *Wilson*, 501 U.S. at 298); *see also Ford*, 108 F.4th at 230.

### 6. The Court Will Dismiss the § 1983 Claim Against PRJA Because Mr. Wilson Does Not Allege that the PRJA Created a Policy or Custom that Resulted in His Claimed Deprivations

#### a. Legal Standard: Municipal Liability for § 1983 Claims

To state a viable claim under 42 U.S.C. § 1983, a plaintiff must allege that "a person" acting under color of state law deprived him or her of a constitutional right or of a right conferred by a law of the United States. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 658 (4th Cir. 1998). "[M]unicipalities [such as PRJA] and other local governmental units [are] . . . among those persons to whom § 1983 applies." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). However, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." 436 U.S. at 691. "A local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Id.* at 694. A government entity is responsible under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or act may fairly be said to represent official policy, inflicts the injury." *Id.*; *see also Collins v. City of Harker Heights*, 503 U.S. 115, 120–21 (1992).

To prevail on a theory of municipal liability, a plaintiff must identify a specific policy or custom, attribute its creation and fault for doing so to the municipality, and establish an "affirmative link" between the policy or custom and the deprivation claimed. *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987) (citations omitted); *see also Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) ("To hold a municipality . . . liable for a constitutional violation under § 1983, the plaintiff must show that the execution of a policy or custom of the municipality caused the violation." (citation omitted)). Further, "[t]o hold a municipality liable for a single

decision (or violation), the decisionmaker must possess 'final authority to establish municipal policy with respect to the action ordered.'" *Love-Lane*, 355 F.3d at 782.

      **b.**     **Mr. Wilson Does Not Allege in Count I that the PRJA Created a Policy or Custom that Resulted in His Claimed Deprivations**

In Count I, Mr. Wilson brings a § 1983 claim for violation of the Eighth Amendment against PRJA. (ECF No. 1 ¶¶ 48–50.) Mr. Wilson states that he sues PRJA "under a theory of direct liability as to all federal claims[.]" (ECF No. 1 ¶ 10.) As a municipal government entity, PRJA can only be held liable under § 1983 on a theory of municipal liability. *See Monell*, 436 U.S. at 691, 694. Defendants do not contest that PRJA is subject to liability under § 1983 and argue only that the Complaint lacks any factual allegations supporting a claim for municipal liability. (*See* ECF No. 51, at 6–7.)

As to the July 2021 basketball game incident, Mr. Wilson fails to allege that the PRJA created a policy or custom responsible for the alleged deprivation of his rights. Mr. Wilson asserts that "two separate employees of [PRJA], both of different positions, and one a supervisor, were deliberately indifferent to [Mr. Wilson's] serious medical need, and deliberately ignored instructions from a medical doctor." (ECF No. 52, at 6.) Mr. Wilson argues that these allegations "lead to the reasonable inference that senior PRJA officials were involved in the torts." (ECF No. 52, at 13–14.) However, the requested inference runs contrary to case law establishing that, in the absence of a government policy or custom, actions of municipal employees do not establish municipal liability. *See Collins*, 503 U.S. at 120–21. Although Mr. Wilson notes that Lieutenant Hackett was "a supervisor," he does not allege that she "possess[ed] 'final authority to establish municipal policy'" on behalf of PRJA, which would be required to hold a municipality liable for an individual employee or agent's actions. *See Love-Lane*, 355 F.3d at 782.

As to the 2022 denials of medical treatment, viewing the facts in the light most favorable to Mr. Wilson, he possibly identifies a specific policy or custom by alleging that, upon his reincarceration in January 2022, PRJA "denied without sufficient explanation" over twenty requests for medical treatment and to see a specialist. (ECF No. 1 ¶ 42.) However, even drawing this inference in favor of Mr. Wilson, he still does not attribute the *creation* of this policy or custom to PRJA. *See Spell*, 824 F.2d at 1389. Mr. Wilson suggests that "[t]his continuing pattern . . . through the actions of various unconnected employees, spanning over a one year period" allows the Court to infer that PRJA created the policy or custom. (ECF No. 52, at 14.)

This suggested inference asks too much. In *Spell v. McDaniel*, the Fourth Circuit recognized the possibility of asserting a claim of municipal custom or usage by condonation of "patterns of unconstitutional conduct." 824 F.2d at 1390. Drawing all reasonable inferences in his favor, Mr. Wilson harkens to a "municipal liability by condonation" theory by identifying a "continuing pattern . . . through the actions of various unconnected employees." (*See* ECF No. 52, at 14.) Even so, the *Spell* court was clear that "[m]unicipal fault for allowing such a developed 'custom or usage' to continue requires (1) actual or constructive knowledge of its existence by responsible policymakers, and (2) their failure, as a matter of specific intent or deliberate indifference, thereafter to correct or stop the practices." 824 F.3d at 1391. In his Complaint, Mr. Wilson alleges neither of these elements of municipal liability by condonation.[9]

---

[9] He cannot now raise these assertions in his opposition brief. *Morgan Distrib. Co. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989) ("[I]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss. To hold otherwise would mean that a party could unilaterally amend a [petition] at will, even without filing an amendment, and simply by raising a point in a brief." (citations and internal quotation marks omitted); *Equity in Athletics Inc. v. Dep't of Educ.*, 504 F. Supp. 2d 88, 111 (W.D. Va. 2007) (explaining that "new

Because he does not plausibly allege that PRJA either created or condoned a policy or custom of denying requests for medical treatment without sufficient explanation, Mr. Wilson fails to state a claim under § 1983 against PRJA for the denied requests for medical treatment.

Mr. Wilson does not state a claim for municipal liability against PRJA under § 1983 as to either the 2021 eye injury incident or the 2022 repeated denials of requests for medical treatment. The Court will dismiss Count I against the PRJA.

### B.   State Law Claims

In Counts II, III, and IV, Mr. Wilson alleges that the PRJ Defendants were negligent. As an initial matter, the PRJ Defendants raise a statute of limitations defense, which bars the state-law claims as to the actions of the PRJ Defendants with respect to the July 2021 basketball game eye trauma and its immediate aftermath. However, at this stage in the litigation, the state-law claims as to the January 2022 and subsequent repeated denials of treatment survive the statute of limitations defense due to the continuing treatment rule.

Second, the Court will explain that Mr. Wilson may proceed on a vicarious liability theory with respect to his state-law claims against PRJA. However, he has not adequately pled a direct liability theory, so the Court will dismiss all direct liability claims against PRJA.

Finally, the Court will address the plausibility of the state-law claims. Count II—alleging gross negligence and negligence—survives the Motion to Dismiss with respect to the January 2022 and subsequent events. Count III—alleging willful and wanton negligence—likewise survives the Motion to Dismiss with respect to the January 2022 and subsequent events. Count

legal theories must be added by way of amended pleadings, not by argument asserted in legal briefs") (collecting cases).

IV—alleging negligent infliction of emotional distress—does not survive the Motion to Dismiss, and the Court will dismiss it.

### 1.   Legal Standard:  Statute of Limitations

A statute of limitations defense may be raised by a motion to dismiss if the time bar is apparent from the face of the complaint. *Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005) (citation omitted).

### a.   Va. Code § 8.01-243.2

Virginia Code § 8.01-243.2 provides the statute of limitations for actions where the plaintiff was incarcerated at the time of the alleged injury and the claim relates to the plaintiff's "conditions of confinement," which is broadly defined. *Lucas v. Woody*, 756 S.E.2d 447, 448–51 (Va. 2014) (applying § 8.01-243.2 to generalized claim that prisoner suffered injury due to defendants' "course of conduct" over a two-month period).

Section 8.02-243.2 provides that

> [n]o person confined in a state or local correctional facility shall bring or have brought on his [or her] behalf any personal action relating to the conditions of his [or her] confinement until all available administrative remedies are exhausted. Such action shall be brought by or on behalf of such person *within one year after [his or her] cause of action accrues*[10] or within six months after all administrative remedies are exhausted, whichever occurs later.

Va. Code § 8.01-243.2 (emphasis added).  The Supreme Court of Virginia has clarified that the statute of limitations provision of § 8.01-243.2 "applies to all personal actions relating to the conditions of an individual's confinement regardless of whether the plaintiff is still incarcerated when such action is filed." *Lucas*, 756 S.E.2d at 451.  Federal district courts in Virginia have

---

[10] Under Virginia law, a cause of action for personal injury accrues on the date the injury occurred. Va. Code § 8.01-230 ("In every action for which a limitation period is prescribed, the right of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained in the case of injury to the person or damage to property[.]").

repeatedly dismissed tort claims governed by § 8.01-243.2 for the plaintiff's failure to file within one year after the date of his or her injury. *See, e.g., Cashion v. Lee*, No. 5:17-cv-4, 2017 WL 5179238, at *2–3 (W.D. Va. Nov. 8, 2017); *Harris v. Commonwealth*, No. 3:07-cv-701 (JRS), 2008 WL 1869279, at *5–6 (E.D. Va. Apr. 24, 2008).

### b.   Continuing Treatment Rule

"[I]t is well established in Virginia that the statute of limitations begins to run when the plaintiff is injured, not when the plaintiff discovers the injury." *Chalifoux v. Radiology Assocs. of Richmond, Inc.*, 708 S.E.2d 834, 837 (Va. 2011). The continuing treatment rule "operates as an exception" under which the statute of limitations begins to run at the conclusion of the course of treatment for a particular disease or condition. *Id.* The continuing treatment rule "presupposes that a continuous course of improper examination or treatment which is substantially uninterrupted is proved as a matter of fact." *Id.* at 838. "'[I]f there existed a physician-patient relationship when the patient was treated for the same or related ailments over a continuous and uninterrupted course, then the plaintiff could wait until the end of that treatment to complain of any negligence which occurred during that treatment.'" *Id.* (quoting *Grubbs v. Rawls*, 369 S.E.2d 683, 687 (Va. 1988)).

### 2.   The Statute of Limitations Bars Mr. Wilson's State-Law Claims Arising from the July 2021 Basketball Game Incident But Not Claims Arising from the January 2022 and Subsequent Repeated Denial of Treatment

Virginia Code § 8.01-243.2 applies to the case at bar because Mr. Wilson was incarcerated at the time of the alleged injuries and the injuries relate to his conditions of confinement. Further, the continuing treatment rule does not connect the July 2021 basketball game incident to the January 2022 and subsequent repeated denial of treatment because they constitute discrete courses of improper examination or treatment, with an interruption when Mr.

27

Wilson was released from prison in October 2021. *See Chalifoux*, 708 S.E.2d at 838. However, the continuing treatment doctrine applies with respect to the January 2022 and subsequent repeated denial of treatment because they constitute "a continuous course of improper examination or treatment." *See id.*

For the reasons articulated below, claims arising from the July 2021 basketball game incident are barred by the statute of limitations, but claims arising from the January 2022 and subsequent repeated denial of treatment are not barred by the statute of limitations.

a.   **Va. Code § 8.01-243.2 Applies to the Case at Bar**

Va. Code § 8.02-243.2 applies to the case at bar because Mr. Wilson's negligence claims "arise from medical care he received while incarcerated" and thus pertain to his conditions of confinement.[11] *See Patten v. Nichols*, 274 F.3d 829, 838 (4th Cir. 2001) ("[T]he medical care a prisoner receives is just as much a 'condition' of his confinement as the food he [or she] is fed, the clothes he [or she] is issued, the temperature he [or she] is subjected to . . . and the protection he [or she] is afforded." (quoting *Wilson v. Seiter*, 501 U.S. 294, 303 (1991))). The statute of limitations under § 8.01-243.2 has passed as to the July 2021 injury because Mr. Wilson filed suit after both the one-year period after the injury and the six-month period after exhausting his administrative remedies. Further, this conclusion is apparent from the face of Mr. Wilson's Complaint, which provides the dates of release and reincarceration. *Dean*, 395 F.3d at 474.

---

[11] Mr. Wilson counters that Va. Code § 8.01-243.2 does not apply to his claims because the injury he suffered does not relate to his "conditions of confinement" where he was "*in public at a public hospital.*" (ECF No. 52, at 12.) This argument is unavailing. He was injured at PRJA. Mr. Wilson was in public to acquire medical treatment that the jail could not provide. (*See* ECF No. 1 ¶ 18–19.) He was escorted by a corrections officer and shackled. (ECF No. 1 ¶ 20, 30.) Prisoner healthcare indisputably constitutes a "condition of confinement." *See Patten*, 274 F.3d at 838.

First, with respect to the one-year post-injury period, Mr. Wilson filed suit in February 2023, which is more than one year after the alleged injury in July 2021. (ECF No. 51, at 11.)

Second, with respect to the six-month period following exhaustion of administrative remedies, Mr. Wilson's possibility to exhaust administrative remedies terminated upon his release from incarceration in October 2021. (*See* ECF No. 1 ¶ 40.) Once Mr. Wilson was released in October 2021, he lost the ability to pursue administrative remedies for the July 2021 incident, meaning all administrative remedies were exhausted, at the latest, in October 2021. To hold otherwise would be to permit the revival upon reincarceration of an otherwise time-barred claim, which would produce an "anomalous" result. *See Lucas*, 756 S.E.2d at 450. Plaintiff's suit in February 2023 came more than six months after his October 2021 release.

Because both the one year post-injury and six months post-exhaustion provisions of Va. Code § 8.01-243.2 expired before Mr. Wilson filed suit in February 2023, the statute of limitations has run as to the July 2021 basketball game incident.

> **b.    The Continuing Treatment Rule Does Not Connect the July 2021 Incident to the January 2022 and Subsequent Repeated Denials of Treatment Requests**

Mr. Wilson asks the Court to find that his allegations are subject to the continuing treatment rule. (ECF No. 52, at 13.) The continuing treatment rule "presupposes that a continuous course of improper examination or treatment which is substantially uninterrupted is proved as a matter of fact." *Chalifoux*, 708 S.E.2d at 838. Even drawing all reasonable inferences in favor of Mr. Wilson, the Court cannot conclude that the July 2021 incident and the January 2022 and subsequent repeated denial of treatment constitute "a continuous course of improper examination or treatment which is substantially uninterrupted." *See Chalifoux*, 708 S.E.2d at 838. The July 2021 acute eye trauma response constitutes a discrete set of facts and

issues from the January 2022 and subsequent repeated denials of requests for medical treatment. *See id.* Further, Mr. Wilson's release from prison in October 2021 presents a "substantial[] interrupt[ion]" to any treatment that was occurring at the jail. *See id.*

The July 2021 incident involved the PRJ Defendants' response to Mr. Wilson's acute eye injury. His claims of negligence with respect to this incident turns on the unreasonable delay in emergency eye surgery due, at least in part, to the decision to transport him by patrol car rather than emergency ambulance from Bon Secours to VCU Medical Center.

By contrast, the denied requests for medical treatment began—according to Mr. Wilson— "*[f]rom the time [he] was reincarcerated in January 2022.*" (ECF No. 1 ¶¶ 41–42 (emphasis added).) The claims of negligence with respect to these repeated denials of treatment to his *right* eye in 2022 turns on insufficient explanation rather than inadequate transport. Further, the 2022 events involved different, unknown actors, and Mr. Wilson has alleged no facts to suggest any continuity with the July 2021 incident. Mr. Wilson's Complaint itself clearly demarcates the beginning of a continuous course of denied requests for medical treatment with insufficient explanation: January 2022. (*See* ECF No. 1 ¶¶ 41–42.) Thus, this "course of improper examination" excludes the July 2021 incident.

Because the only allegations Mr. Wilson makes against Officer Ramirez-Castro and Lieutenant Hackett concern the July 2021 basketball game incident, the Court will dismiss Counts II through IV as to Officer Ramirez-Castro and Lieutenant Hackett as barred by the statute of limitations.

### c. The Continuing Treatment Rule Plausibly Applies to the Repeated Denial of Treatment

However, taking the facts alleged to be true and drawing all reasonable inferences in Mr. Wilson's favor, he has adequately alleged a proper application of the continuing treatment rule to

the January 2022 and subsequent denials of his treatment requests. Mr. Wilson has plausibly

alleged "a course of improper examination," *see Chalifoux*, 708 S.E.2d at 838, in this case

submitting "over twenty requests for medical treatment and to see a doctor." (ECF No. 1 ¶ 42.)

Mr. Wilson alleges that "each and every time . . . his request has been denied without sufficient

explanation." (ECF No. 1 ¶ 42.) Because the prison medical system served as Mr. Wilson's sole

access to a physician, the Court is willing at this stage of the litigation to infer that a physician-

patient relationship existed notwithstanding the fact that numerous prison staff members may

have denied the requests. Mr. Wilson alleges that he "was [not] treated for the same or related

ailments over a continuous and uninterrupted course," *Chalifoux*, 708 S.E.2d at 837, of at least

nine months between January 2022 and September 2022. (ECF No. 1 ¶¶ 42–43.) Thus, Mr.

Wilson's Complaint, filed in February 2023, is not foreclosed by the one-year statute of

limitations as to the January 2022 and subsequent repeated denials of medical treatment.

### 3.   Mr. Wilson Does Not State a Claim for Direct Liability of PRJA for Tortious Actions of its Employees

#### a.   Legal Standard:  Direct Liability of Employers

It is well settled in Virginia law that a claim for vicarious liability under the doctrine of

*respondeat superior* is distinct from a claim for direct liability against an employer. *See Parker*

*v. Carilion Clinic*, 819 S.E.2d 809, 823–24 (Va. 2018). An employer can only be directly liable

as a tortfeasor where it "authorized, directed, ratified, or performed the tortious conduct through

those who, under the governing management structure, had the discretionary authority to act on

behalf of the [employer]." *Id.*; *accord Law v. Hilton Domestic Operating Co.*, No. 3:20-cv-145

(DJN), 2020 WL 7130785, at *7 (E.D. Va. Dec. 4, 2020).

Tortious actions of individual employees give rise only to vicarious liability on the part of

the employer, while a claim for direct liability against the employer requires that the employer

31

itself acted as the tortfeasor. *Parker*, 819 S.E.2d at 823. The latter requires tortious conduct by

"those who, under the governing management structure, had the discretionary authority to act on

behalf of the [organization]." *Id.* A claim for direct liability fails when the plaintiff does not set

forth sufficient facts to show that the individual tortfeasors identified had the requisite authority

to act on behalf of the employer. *Id.*

> **b.      Mr. Wilson Does Not Allege that the Individual Tortfeasors
>           Had the Requisite Authority to Act on Behalf of PRJA**

Mr. Wilson's Complaint clarifies that "Defendant PRJA is being sued . . . under a theory

of direct liability and/or *respondeat superior* as to all state claims." (ECF No. 1 ¶ 10 (emphasis

added).) The Court will dismiss the direct liability theory because Mr. Wilson does not allege

that PRJA "authorized, directed, ratified, or performed the tortious conduct through those who,

under the governing management structure, had the discretionary authority to act on behalf of"

PRJA. *See Parker*, 819 S.E.2d at 823. A claim for direct liability fails when the plaintiff does

not set forth sufficient facts to show that the individual tortfeasors identified possessed the

requisite authority to act on behalf of the employer. *See Parker*, 819 S.E.2d at 823–24.

In his Complaint, Mr. Wilson does not identify which individual employees were

responsible for the treatment request denials, stating only that "each and every time . . . his

request[s] ha[ve] been denied without sufficient explanation by PRJA." (ECF No. 1 ¶ 42.)

Although the Complaint asserts that "[a]ll acts . . . were committed . . . while performing tasks

specifically authorized and ratified by the PRJA," (ECF No. 1 ¶ 7), this conclusory allegation is

"not entitled to the assumption of truth." *See Iqbal*, 556 U.S. at 679. The conclusion lacks any

"factual enhancement . . . to cross the line between possibility and plausibility of entitlement to

relief." *Francis*, 588 F.3d at 193 (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks

omitted); *see also Twombly*, 550 U.S. at 555.

Because Mr. Wilson alleges no facts from which the Court could find that PRJA authorized and ratified the allegedly tortious conduct, the Court will dismiss the direct liability theory. The Court next assess each state-law claim under a theory of vicarious liability.

### 4. Mr. Wilson States a Claim for Negligence Against PRJA

#### a. Legal Standard: Negligence

Virginia recognizes three degrees of negligence: (1) simple or ordinary negligence; (2) gross negligence; and, (3) willful or wanton negligence. *Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 918 (Va. 2004). The three levels of negligence "do not represent separate claims or theories of liability." *Wilby v. Gostel*, 578 S.E.2d 796, 800–01 (Va. 2003). Instead, the three levels identify the different burdens of proof a plaintiff must meet. *Id.* at 801; *see Knight v. Moore*, 18 S.E.2d 266, 270 (Va. 1942). Based on the evidence presented, the finder of fact determines the appropriate level of negligence after the parties have conducted discovery, on a motion for summary judgment, or during trial. *Id.* at 801. Only when "reasonable minds could not differ," should these issues be decided by the Court. *Poliquin v. Daniels*, 486 S.E.2d 530, 534 (Va. 1997) (citation omitted). Mr. Wilson alleges all three degrees of negligence in Counts II and III. Because the July 2021 incidents are time-barred, *see supra*, the Court considers only the negligence claims against PRJA for conduct arising from the January 2022 and subsequent repeated denial of treatment.

"The essential elements of a negligence claim in Virginia, as elsewhere, are (1) the identification of a legal duty of the defendant to the plaintiff; (2) a breach of that duty; and (3) injury to the plaintiff proximately caused by the breach." *Talley v. Danek Medical, Inc.*, 179 F.3d 154, 157 (4th Cir. 1999) (citation omitted). Under Virginia law, "[t]he standard of conduct to

which a party must conform to avoid being negligent is that of a reasonable [person] under like circumstances." *Id.* at 157–58 (citation omitted).

> **b.** **Mr. Wilson States a Claim for Simple Negligence Against PRJA**

With respect to the repeated denials of treatment, viewing the facts in the light most favorable to Mr. Wilson and drawing all reasonable inferences in his favor, Mr. Wilson's allegation that his "complaints continue to be ignored," (ECF No. 1 ¶ 44), both identifies a legal duty—not to ignore his treatment requests—and articulates a breach of that duty—ignoring his requests. Mr. Wilson plausibly alleges injury caused by the breach by stating that he continues to "suffer[] extreme pain in the eye, headaches, and [loss of] his vision in his other eye" without avenue for redress. (ECF No. 1 ¶ 42.) That Mr. Wilson finally saw Dr. Bhat in September 2022, nine months after making his first request for medical treatment, does not eliminate the possible negligence of the delay itself. *See, e.g., Great Atl. & Pac. Tea Co. v. Rosenberger*, 124 S.E.2d 26, 28 (Va. 1962) ("[T]he defendant was required to [act] without unreasonable delay.").

Because Mr. Wilson has plausibly stated a claim for negligence based on PRJA, through its employees, ignoring his requests for medical treatment for nine months, the Court will deny the PRJ Motion as to the negligence count against PRJA.

> **5.** **Mr. Wilson States a Claim for Gross Negligence Against PRJA**

> **a.** **Legal Standard:  Gross Negligence**

To demonstrate gross negligence under Virginia law, a plaintiff must show that the defendant's conduct demonstrates a "want of even scant care and amounts to the absence of slight diligence." *City of Lynchburg v. Brown*, 613 S.E.2d 407, 410 (Va. 2005) (citation omitted). It is a "degree of negligence which shows an utter disregard of prudence amounting to complete neglect of the safety of another." *Id.* (quoting *Frazier*, 362 S.E.2d at 691).  In other words, a

claim of gross negligence fails when the defendant exercised *some* degree of care. *Elliot v. Carter*, 791 S.E.2d 730, 732 (Va. 2016).  Further, "a claim of gross negligence fails as a matter of law where there is no deliberate conduct by the defendant." *Reid v. Newton*, No. 3:13cv572 (JRS), 2014 WL 1493569, at \*7 (E.D. Va. Apr. 14, 2014) (citing *Brown*, 613 S.E.2d at 410); *see also Chapman v. City of Va. Beach*, 475 S.E.2d 798, 801 (Va. 1996) ("Deliberate conduct is important evidence on the question of gross negligence." (internal quotation omitted)). "Whether gross negligence has been established is usually a matter of fact to be decided by a jury." *Chapman*, 475 S.E.2d at 801.

**b.**     **Mr. Wilson States a Claim for Gross Negligence Against PRJA**

Whether Mr. Wilson has established gross negligence by PRJA in permitting Mr. Wilson's requests for medical treatment due to extreme eye pain, headaches, and loss of vision to go ignored for nine months is a matter of fact to be decided by a jury. *See Chapman*, 475 S.E.2d at 801 (finding gross negligence where the defendant chose to delay action).  Thus, the Court will deny the PRJ Motion with respect to the gross negligence claim against PRJA based on the January 2022 and subsequent repeated denial of treatment.

**6.**     **Mr. Wilson States a Claim of Willful and Wanton Negligence Against PRJA**

**a.**     **Legal Standard:  Willful and Wanton Negligence**

The theory of willful and wanton negligence differs from gross negligence because it requires a showing that the defendant acted in conscious disregard "of another person's rights or . . . with reckless indifference to the consequences, with the defendant aware, from his [or her] knowledge of existing circumstances and conditions, that his [or her] conduct probably would cause injury to another." *Amisi v. Riverside Reg'l Jail Auth.*, 469 F. Supp. 3d 545, 576 (E.D. Va. 2020) (quoting *Etherton v. Doe*, 597 S.E.2d 87, 90 (Va. 2004) (internal quotations and citations

omitted)); *but see Alfonso v. Robinson*, 514 S.E.2d 615, 618 (Va. 1999) (stating that willful and wanton negligence "requires an actual or constructive consciousness that injury *will result* from the act done or omitted" (emphasis added) (citation omitted)). Given the requirement that the defendant knew his or her actions were likely to cause harm, a claim for willful and wanton negligence is essentially one for deliberate indifference. *See Hixson v. Hutcheson*, No. 5:17-cv-32, 2018 WL 814059, at *6 (W.D. Va. Feb. 9, 2018) (noting that gross negligence requires a lesser showing than deliberate indifference because deliberate indifference requires subjective knowledge of a substantial risk).

      **b.**     **Mr. Wilson States a Claim of Willful and Wanton Negligence Against PRJA Because the Court Can Infer Knowledge of Likely Injury**

Mr. Wilson's allegations that PRJA employees ignored his complaints of extreme pain and loss of vision for months permit an inference at the motion to dismiss stage that the staff members responding to his requests for medical treatment knew that their denials were likely to injure Mr. Wilson. At a minimum, these allegations permit an inference that the PRJA employees' actions were "taken . . . with reckless indifference to consequences that the defendant [wa]s aware, from his [or her] knowledge of existing circumstances and conditions, would probably result from his [or her] conduct and cause injury." *See Kaltman v. All Am. Pest Control, Inc.*, 706 S.E.2d 864, 871 (Va. 2011).

The Court disagrees with PRJA's assertion that "[t]he allegations concerning unnamed officers in 2022 are too vague and generalized to support th[e] knowledge element" of a willful and wanton negligence claim. (ECF No. 53, at 14.) At this stage in the litigation, the Court must draw all reasonable inferences in the light most favorable to Mr. Wilson. *Twombly*, 550 U.S. at 556. Accordingly, the Court reasonably infers that when Mr. Wilson says his requests were

"ignored", any responses he received were boilerplate responses lacking any specific reasoning. With this inference in mind, that the Complaint does not explain exactly why the denials were "without sufficient explanation" can be understood as a result of the denials themselves failing to address the requests and/or provide a reason for the delay in providing medical treatment.

Further, at this stage in the litigation the Court can infer from the facts alleged that "the need for treatment [wa]s obvious, yet medical officials provided medical care that [wa]s so cursory as to amount to no treatment at all." *See Boley*, 2022 WL 16950920, at *9 (citing *King v. United States*, 526 F. App'x 358, 362 (4th Cir. 2013)) (analyzing deliberate indifference claim). Mr. Wilson alleges that he experienced extreme pain daily, had headaches, and experienced a loss of vision, so requested "medical treatment and to see a doctor." (ECF No. 1 ¶ 42.) "A prison medical professional who serves as a gatekeeper for other medical personnel capable of treating the condition may be held liable under the deliberate indifference standard if she [or he] delays or refuses to fulfill that gatekeeper role." *Boley*, 2022 WL 16950920, at *8 (cleaned up) (quoting *Mata*, 427 F.3d at 751); *see also Sealock*, 218 F.3d at 1211 (finding deliberate indifference where prison officials "prevent[ed] an inmate from receiving treatment or den[ied] him access to medical personnel capable of evaluating the need for treatment" and "the medical professional [knew] that his role in a particular medical emergency [was] solely to serve as a gatekeeper for other medical personnel capable of treating the condition").[12]

---

[12] Although these cases arose in the deliberate indifference context, the parties acknowledge that the standards are similar. The parties' briefs equate willful and wanton negligence and deliberate indifference and suggest that the claims rise or fall together. (*See* ECF No. 51, at 16 ("[A] claim for willful and wanton negligence is essentially one for deliberate indifference."); ECF No. 52, at 17 ("[W]illful and wanton conducts mirrors deliberate indifference."); ECF No. 53, at 13–14 ("[Plaintiff's] willful and wanton negligence claim rises or falls with his claim for deliberate indifference[.]").) The Court concludes that these deliberate indifference authorities provide useful guidance on establishing subjective awareness of a risk of injury in the context of willful and wanton negligence. *See Hixson*, 2018 WL 814059, at *6.

Because Mr. Wilson's allegations permit an inference that the PRJA employees knew that denying his treatment requests would likely injure Mr. Wilson, the Court will deny the PRJ Motion as to the willful and wanton negligence claim against PRJA.[13]

### 7. Mr. Wilson Does Not State a Claim for Negligent Infliction of Emotional Distress

#### a. Legal Standard: Negligent Infliction of Emotional Distress

To survive a motion to dismiss on a claim for negligent infliction of emotional distress, plaintiffs must allege (1) a physical injury (2) proximately caused by (3) negligent conduct (4) wantonly afflicted by the defendant (5) upon plaintiffs. *Guerrero v. Deane*, No. 1:09cv1313 (JCC/TRJ), 2010 WL 670089, at *16 (E.D. Va. Feb. 19, 2010). The rule requiring physical injury has been clarified by the Supreme Court of Virginia, which has held that

> where conduct is merely negligent, not willful, wanton, or vindictive, and physical impact is lacking, there can be no recovery for emotional disturbance alone. We hold, however, that where the claim is for emotional disturbance [a]nd physical injury resulting therefrom, there may be recovery for negligent conduct, notwithstanding the lack of physical impact, provided the injured party properly pleads and proves by clear and convincing evidence that his [or her] physical injury was the natural result of fright or shock proximately caused by the defendant's negligence.

---

[13] Notwithstanding note 12, the Court here concludes that the willful and wanton negligence claim survives against PRJA where the § 1983 deliberate indifference claim fails. *See supra*, Part III.A.6. The reason for this apparently incongruous result is that vicarious liability does not exist for a § 1983 claim but does exist for a state-law tort claim. *Compare Monell*, 436 U.S. at 691 ("[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory.") *with Kensington Assocs. v. West*, 362 S.E.2d 900, 901 (Va. 1987) ("Under the doctrine of *respondeat superior*, an employer is liable for the tortious act of his [or her] employee if the employee was performing his [or her] employer's business and acting within the scope of his [or her] employment."). Although Mr. Wilson did not identify a policy or custom sufficient to establish municipal liability of PRJA under § 1983, Mr. Wilson has stated a claim of willful and wanton negligence by unnamed PRJA staff, for whose allegedly tortious acts PRJA may be vicariously liable.

*Hughes v. Moore*, 197 S.E.2d 214, 219 (Va. 1973).  This cause of action is "quite limited in

Virginia law," *Dao v. Faustin*, 402 F. Supp. 3d 308, 321 (E.D. Va. 2019), and cannot function as

an alternative means of recovering emotional damages for a personal injury.  *See Beach v.*

*McKenney*, 82 Va. Cir. 436, 2011 WL 7493433, at *4 (City of Charlottesville Cir. Ct. 2011)

("Plaintiff has the definition of the claim backward . . . his claim of mental anguish resulting

from the injuries sustained in the assault and battery is an issue of damages, not a separate cause

of action.").

> **b.**   **Mr. Wilson Does Not State a Claim for Negligent Infliction of**
> **Emotional Distress**

Mr. Wilson alleges emotional damages resulting from the permanent loss of vision in his

left eye, extreme pain in his left eye, debilitating headaches, and the beginning of vision loss in

his right eye.  (*See* ECF No. 1 ¶ 46.)  He does not allege that Defendants' conduct caused

emotional distress that *itself* resulted in a separate and distinct physical injury.  Mr. Wilson's

argument that these allegations state a claim for NIED misconstrues NIED under Virginia law.

A plaintiff can always recover emotional damages for an injury resulting from a physical

impact.  *See Hughes*, 197 S.E.2d at 215–16; *see Beach*, 2011 WL 7493433, at *4 ("claim of

mental anguish resulting from the injuries sustained . . . is an issue of damages, and not a

separate cause of action").  NIED, by contrast, permits recovery even where there is *no* physical

impact, so long as the "physical injury was the natural result of fright or shock proximately

caused by the defendant's negligence." *Hughes*, 197 S.E.2d at 219.

Here, Mr. Wilson alleges that he "has suffered the emotional damage that *comes from*

these painful experiences [of physical injury] . . . [including] depression, anxiety, and loss of

sleep." (ECF No. 1 ¶ 46.)  Mr. Wilson's NIED claim is, in effect, a repetition of his claim for

emotional damages due to the physical injuries he has suffered.  Virginia courts have expressly

recognized that this type of duplicative pleading cannot sustain a claim for NIED. *See Beach*, 2011 WL 7493433, at *4 ("Plaintiff has the definition of the claim backward . . . his claim of mental anguish resulting from the injuries sustained in the assault and battery is an issue of damages, not a separate cause of action."). Accordingly, the Court will dismiss the claim for negligent infliction of emotional distress.

### C.   **Punitive Damages and Injunctive Relief**

In addition to compensatory damages, Mr. Wilson seeks punitive damages, attorneys' fees, and injunctive relief. (ECF No. 1, at 9.)

Punitive damages are available under § 1983 for "conduct that involves 'reckless or callous indifference to the federally protected rights of others,' as well as for conduct motivated by evil intent." *Cooper v. Dyke*, 814 F.2d 941, 948 (4th Cir. 1987) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Under Virginia law, willful and wanton misconduct is required for a punitive damages award. *Riddick v. Watson*, 503 F. Supp. 3d 399, 425 (E.D. Va. 2020) (citing *Huffman v. Love*, 427 S.E.2d 357, 259 (Va. 1993); Va. Code § 8.01-52). Because, at this state of litigation, Mr. Wilson has plausibly alleged a § 1983 claim and a willful and wanton negligence claim, he has a possible basis to recover punitive damages and attorneys' fees.

Injunctive relief requires a showing that: (1) he or she has suffered an irreparable injury; (2) monetary damages and all other available remedies at law are inadequate; (3) an equitable remedy is warranted given the balance of hardships between the parties; and, (4) the relief sought would serve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). A significant change in circumstances—such as, in the prison context, an inmate's transfer or release from the defendant facility—can render moot a claim for injunctive relief. *See Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009).

At this stage, the Court is not prepared to state as a matter of law that Mr. Wilson cannot satisfy the requirements set out in *eBay*. *See Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 770 (D. Md. 2015). The Complaint does not articulate the specific injunctive relief Mr. Wilson seeks. (*See generally* ECF No. 1.) Based on the facts and claims presented, however, the Court infers that he seeks an affirmative injunction for additional medical care. At this early stage of the litigation, and drawing all reasonable inferences in Mr. Wilson's favor, Mr. Wilson has adequately alleged facts that allow his injunctive relief request to survive. *See Cole v. Ishee*, No. 5:22-CT-03218-M, 2024 WL 872266, at *2 (E.D.N.C. Feb. 29, 2024) (citing *Johnson v. McCowan*, 549 F. Supp. 3d 469, 477–78 (W.D. Va. 2021) (finding inmate future harm claim sufficiently concrete at pleading and finding premature defendants' argument seeking to narrow injunctive relief); *Salisbury Univ.*, 123 F. Supp. 3d at 770 (finding plaintiffs sufficiently alleged facts for the prayer for injunctive relief to survive dismissal)).

First, as to irreparable injury, Mr. Wilson has alleged that he has suffered total loss of vision and extreme pain in his left eye, debilitating headaches, some loss of vision in his right eye, and "the emotional damage that comes from these painful experiences," to include "depression, anxiety, and loss of sleep." (ECF No. 1 ¶ 46.); *see De'Lonta*, 330 F.3d at 634; *see also Garrett*, 254 F.3d at 950 ("[T]he substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain."). He also alleges the future injury of continued denials of requests for medical care while he is still incarcerated. (ECF No. 1 ¶¶ 42–44.) Second, Mr. Wilson has plausibly alleged that monetary damages are inadequate because he continues to experience extreme pain and debilitating headaches. Third, Mr. Wilson has plausibly alleged that an equitable remedy is warranted given the balance of hardships between the parties because, as an incarcerated individual, Mr. Wilson has no other option but to seek

medical care through PRJ staff—and PRJ staff have a concomitant duty to provide constitutionally adequate medical care. *See Boley*, 2022 WL 16950920, at *8 ("Prison-based medical staff are required to provide inmates with constitutionally adequate treatment, not merely 'some treatment.'" (quoting *De'Lonta*, 708 F.3d at 526)). Fourth, Mr. Wilson has plausibly alleged that the relief sought would serve the public interest because the public has an interest in enforcing the constitutionally required minimum standard of medical care in our prison system. *See id.*

These findings do not preclude Defendants from raising arguments against injunctive relief at a later stage in this case. But on this motion to dismiss, Mr. Wilson has alleged sufficient facts to sustain his prayer for injunctive relief. *See Salisbury Univ.*, 123 F. Supp. 3d at 771.

### IV.  Conclusion

For the foregoing reasons, the Court will grant in part and deny in part the PRJ Motion. (ECF No. 50.) The Court will deny the Bhat Motion. (ECF No. 54.)

An appropriate Order shall issue.

It is SO ORDERED.


Date: 9/6/2024
Richmond, Virginia

_____
M. Hannah Lauck
United States District Judge